KEITH H.S. PECK            6825

LEGALACTION ALC
116 Desert Lotus
Irvine, CA  92618
Telephone: (877) 570-7333
Facsimile: (877) 570-1233
E-mail: supervising@advocacy-project.com

Attorney for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| In the Matter of B.B., by and through his mother K.B., | Civ. No. 20-00350 HG-WRP (other civil action) |
| Plaintiffs, | PLAINTIFFS' OPENING BRIEF; CERTIFICATE OF WORD COUNT; CERTIFICATE OF SERVICE |
| vs. | **ORAL AGRUMENT** |
| DEPARTMENT OF EDUCATION, STATE OF HAWAII and CHRISTINE KISHIMOTO, in her official capacity as Superintendent of the State of Hawaii, Department of Education, | DATE: March 16, 2021 TIME:  10:30 a.m. JUDGE: Hon. HELEN GILLMOR |
| Defendants, | |

### PLAINTIFFS' OPENING BRIEF

COMES NOW, Plaintiffs B.B., by and through his mother K.B., by and through their attorney undersigned, hereby submit their Opening Brief for this honorable Court's review and consideration.

## I.    INTRODUCTION

The main issue in this case arises from the language used in the February 5, 2020 IEP document. On that day, Student's IEP team held the 3rd and final IEP meeting to complete Student's annual IEP. They had already reviewed Student's Present Levels of Performance, his Goals and Objectives and thus began to discuss the amount of Special Education minutes the student needed. This conversation dovetailed into a discussion on placement; where Student could receive his services. The DOE members of the IEP team made it clear that Student was unsuccessful in his current placement because he was not under "instructional control". He was not able to be bought into any general education settings, and he was not able to receive academic instruction. In fact, he was uncontrollable and had to be kept in a bare room so he could not use any objects to hurt his aides or the Behavioral Health Specialist, Edward Keenan. During the discussion regarding whether Student qualified for services during school breaks, i.e., Extended School Year services, the DOE stated that since the DOE was unable to provide Student academic instruction during the 2019-2020 school year, there was no way to determine if he would regress during breaks in school intersessions.

The Behavioral Health Service provider, Mr. Keenan originally believed that Student should be placed into a separate facility off school campus in a room by himself. The team then considered the input of Parent and she recalled how her son

had been successful in a Home and Community setting in the previous year that the school had funded and that was overseen by CARD, the Center for Autism and Related Disorders. Eventually, the team agreed that isolation in a room at a clinic was not appropriate and agreed that Student's IEP would be implemented in a Home, Community and Clinic setting with access to non-disabled peers when Student's new BCBA believed he was ready. Putting Student in a class with disabled peers trigger's his anger. He does not like to think that he is dumb. This is why placing him at Horizons Academy, or different special education school was not an option for the IEP team.

Before the meeting ended, the IEP team reviewed the language that would be used in the IEP document at item #23. It was stated clearly, "We had agreed that we will be in a setting encompassing the home, community and clinical setting." It was repeated: "Home, Community and clinic setting." Then it was affirmed, "Sound's good to me." And reconfirmed: "it was special placement in the home, community and clinical setting. Um, access to non-disabled peers during community settings." However, and inexplicably the statement was altered when the written IEP emerged. Instead, the written IEP states: "Student will participate in a modified day schedule at a separate facility. He will have access to non-disabled peers in a community setting within safe parameters (developed by providers working with him). No mention of the Home aspect of the placement is made at all.

The other issue in this appeal is the failure of the DOE to implement the February 5, 2020 IEP. During the February 5, 2020 IEP meeting Parent's counsel informed the DOE that now that the team had completed the IEP, it was the DOE that had to determine where and how it was implemented. This is in keeping with the responsibilities of the parties. The team determines what services and supports a student needs and the DOE has to right to determine where and who implements those services.

In a letter dated February 28, 2020 written by Principal Winkie to Parent, the Principal mentions *potential* locations for the implementation of Student's written IEP as "..a private facility operated by Bocha, Inc. or implementation of the IEP at MAC (Maui Autism Center). Still no mention of the Home aspect of Student's placement as the team had agreed. According to the Principal, its was either going to be implemented at a private facility operated by Bocha, Inc. or at MAC.

However, the offer of MAC in the 2/28/2020 letter by Principal Winkie was before the DOE made an observation of that facility. Upon observation, both Parent as BHS Edward Keenan said it would be unsafe because of a clutter. Student, Mr. Keenan had said at the IEP meeting was placed into a room at public school with nothing in it that he could use as a weapon. MAC had 2 other very disabled student in a small space and the room was festooned with objects Student could use to terrorize other children and providers.

4

Unbeknownst to Parent Victoria Leworthy wrote to Howard Greenberg of MAC on March 30, 2020 asking him: "I am checking in to see if there is still availability for this student to be placed in your program or a hybrid/transition program between home and school."

In the meantime, and prior to the administrative hearing in this matter, the parties continued to negotiate over settlement terms. Parent awaited a promised counteroffer from the DOE. It finally came about 10 days before the start-date of the hearing, but when the offer did not meet Student's needs, she arranged for CARD (Center for Austism and Related Disorders) oversite, a local BCBA, Board Certified Behavior Technician, and ran an ad on the website indeed.com which garnered 9 qualified candidates for the position of RBT, Registered Behavioral Technician. She also secured a special education teacher to consult with the RBTs and BCBAs in the implementation of the program. Many sought to work on Student's program because it is a "no-profit" program. Instead of paying an RBT $21/per hour and charging the DOE $75/hr and pocketing the rest, Parent is offering $35/hr to the RBTs and seeks reimbursement of that amount only. Applications came in from RBT's working from all of the existing programs on Maui, including Bocha, Inc. and MAC.

At the time of the administrative hearing, the DOE had failed to tender any means to implement the February 5, 2020 IEP. Finally, in or about November 2020, the DOE did make an offer to implement the IEP and Parent accepted the provider

the DOE tendered. That provider MAC withdrew when Parent would not waive liability for potential negligence by MAC.

## II.  STANDARD OF REVIEW

The IDEA provides that a court, in reviewing a due process hearing, "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). But "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982).

Under the IDEA, district courts give "considerably less deference to state administrative proceedings than they do in most instances of 'judicial review of . . . agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review.'" *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1053 (9th Cir. 2012) (quoting *E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist. Office of Admin. Hrgs.*, 652 F.3d 999, 1005 (9th Cir. 2011). District courts review conclusions of law de novo, while at the same time giving "due weight" to the administrative hearing officer's findings. See *Ashland Sch. Dist.*

*v. Parents of Student R.J.*, 588 F.3d 1004, 1008 (9th Cir. 2009); *Amanda J. ex rel. Annette J. v. Clark Cty Sch. Dist.,* 267 F.3d 877, 887 (9th Cir. 2001) ("Complete de novo review . . . is inappropriate."). In the instant appeal, the review, however, is with regard to the application of the reasoning the administrative law judge used to determine that the DOE did not deny Student a FAPE when the written offer of FAPE did not comport with the agreements during the IEP development process and when the DOE failed to arrange to implement the IEP. This is a de novo review.

While "due weight" must be given to the administrative decision, the amount of deference afforded is informed by the hearing officer's carefulness and thoroughness. See *L.M. v. Capistrano Unified Sch. Dist*., 556 F.3d 900, 908 (9th Cir. 2009); *J.W. ex rel. J.E.W. v. Fresno Unified School Dist*., 626 F.3d 431, 440– 41 (9th Cir. 2010); see also *Ashland,* 588 F.3d at 1009 ("In the end, however, the court is free to determine independently how much weight to give the state hearing officer's determinations."). Courts in the Ninth Circuit give deference to an administrative law judge's decision "when it 'evinces his [or her] careful, impartial consideration of all of the evidence and demonstrates his [or her] sensitivity to the complexity of the issues presented.'" *J.W*., 626 F.3d at 438 (quoting *Cty. of San Diego v. Cal. Special Educ. Hrg. Off*., 93 F.3d 1458, 1466 (9th Cir. 1996)).

The burden of proof rests with the party challenging the administrative decision. *Hood v. Encinitas Union Sch. Dist*., 486 F.3d 1099, 1103 (9th Cir. 2007);

*Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994).

## III.   LEGAL QUESTIONS

### A.   Whether the Written IEP Denies Student a FAPE where it Does Not Reflects the Decisions of the 02/05/2020 IEP team.

There are 3 distinct components of the written 02/05/2020 IEP that do not comport with the decisions made at the IEP meeting of that date. This first 2 of these alternations was to Student's placement statement. Instead of a placement statement as developed and clearly delineated during the IEP meeting by the IEP team members, the DOE redefined the statement regarding both the length of the school day and the setting in which the program was to be delivered. This issue was identified in the Prehearing Order as Issue 7.

*Issue 7 – Whether the 02/05/2020 IEP document accurately reflects the agreement of the IEP team for Student's placement.*

On February 5, 2020, Student's current IEP was completed by his IEP Team. See P1/001-019. The IEP at page 16 reads:

> [Student] will participate in a modified day schedule at a separate facility. He will have access to non-disabled peers in a community setting within safe parameters (developed by providers working with him).

There are 2 changes to the decisions made by Student's IEP team in this description of the Student's placement. First, the team affirmatively determined not to change Student's school-day schedule. The team considered whether or not to change the length of Student's school day and agreed that it should remain the same

8

as was in the former IEP. Beau Laughlin testified to this matter. Tr. p. 358:9-25, p. 359:1-2. The audio recording of the IEP also testifies to this matter. P5: 01:18:00 – 01:18:45 (approx.). So, while the IEP team agreed to keep the length of Student's school-day the same as in his current public-school placement and wait to make adjustments if the new staff determined it necessary, the written IEP calls for a "modified day schedule".

The second change to the agreed-upon placement that emerged in the written IEP is more significant. Instead of the program designed by the 02/05/2020 IEP team after deliberations on what environmental factors would influence Student's success, the written IEP places Student "…at a separate facility." This is in stark contrast to the placement clearly defined during the IEP meeting as "Home community and clinic setting." P5:01:30:19 – 1:31:35 (approx.).  This placement was affirmed in the testimony of Beau Laughlin. Tr. p. 359:14-25, 360:1.

In determining the appropriate setting for the implementation of Student's IEP the team reviewed the continuum of potential placements and determined that the home and community setting was essential to Student's success. This discussion started at P5:00:38:54 – 00:53:54, where the team talked about what wasn't working for Student. Then the team discussed what had been successful for Student in the past. P5:00:53:58 – 01:01:28 (approx.). The discussion continued through the continuum of potential placements. P5:01:01:32 – 01:05:00.

The team eventually came to a conclusion about a hybrid placement with

9

Student's attorney stating "…now that we have defined the program, you guys figure out how to implement it." P5:01:05:35 – 01:14:13 (approx.). What is clear is that the whole IEP team engaged in a thoughtful discussion about what would work as the setting for Student, given his history, and determined that the Home, Community and Clinical setting was most appropriate and the least restrictive placement.

Without the inclusion of the agreements made by the IEP team for specific modification for Student's program and services, the IEP was not "individually designed to provide educational benefits to the handicapped child," and this failure resulted in a substantive denial of FAPE to Student. See *Gregory K. v. Longview Sch. Dist.,* 811 F.2d, 1307, 1314 (9th Cir. 1987).

Once an IEP Team agrees to the appropriateness of a service, it should not be subject to approval or rejection by DOE administrators outside of the IEP Team.  "In any contest between systemic efficiency and the provision of [an individualized] FAPE to a disabled child, Congress and the Supreme Court have made clear that the child must prevail."  *Reusch v. Fountain*, 872 F. Supp. 1421, 1432 (D. Md. 1994) (citing *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 114 S. Ct. 361, 366 (1993)).

There are precious few safeguards for families under the IDEA, but one fundamental safeguarded conferred and worthy of protection is that material services must be defined to that degree which would allow them to be faithfully implemented

and, if necessary, challenged by a parent after they are not implemented.  See 34

C.F.R. Part 300 Appendix C (stating the IEP is "a compliance/monitoring

document").

The Ninth Circuit Court of Appeals recently issued a decision in *M.C. v.*

*Antelope Valley Union High Sch. Dist.* (9th Cir., Mar. 27, 2017, No. 14-56344) ___

F.3d ___ [2017 U.S.App. LEXIS 5347, concluding that the IDEA provides parents a

right to participate in every step of the IEP drafting process, including monitoring

and enforcement of the IEP. Although in that case the parent participated in the IEP

meeting, a typographical error obfuscated the offer and meant that she could not use

the IEP to monitor and enforce the services her child would be provided.

Additionally, although the IEP team discussed the types of AT devices during the

IEP meeting, the written IEP did not reflect the specific devise that were to be used

which "rendered the IEP useless as a blueprint for enforcement." Thus, the failure to

identify the AT devices in the IEP was an additional violation. Certainly, the failures

of the written IEP in the instant case are far more significant than those in *M.C. v.*

*Antelope Valley.*

Congress and the courts had already determined that this is a reasonable

requirement.  The Ninth Circuit made clear, in *Union Sch. Dist. v. Smith*, 15 F.3d

1519, 1526 (9th Cir. 1994), that:

> We find that formal requirement [of a specific offer of FAPE] has an
> important purpose that is not merely technical, and we therefore believe it

should be enforced rigorously. The requirement of a formal, written, offer creates a clear record that will do much to eliminate troublesome factual disputes many years later about when placements were offered, what placements were offered, and what additional educational assistance was offered to supplement a placement, if any. Furthermore, a formal, specific, offer from a school district will greatly assist parents in "present[ing a] complaint with respect to any matter relating to the … educational placement of the child.

The written IEP does not reflect the decisions of Student's 02/05/2020 IEP team. As such, the written IEP is not a FAPE for it is not what the IEP Team determined was necessary and appropriate for Student.

*Issue 2 – Whether the 02/05/2020 IEP should be implemented in the home, community and clinical setting.*

Listening to the discussions of the IEP team members during the 02/05/2020 IEP meeting, it should be apparent that there was a concern that isolating Student in a clinical environment would be overly restrictive and because he had been successful in a home and community setting in the recent past, that setting would be part and parcel of his new program. There was no decision to first isolate him in a clinical environment and later provide the home and community settings. It was described as a hybrid, multi-facetted placement where the advantages of each could be mined. At the time of the 02/05/2020 IEP meeting, Student was being isolated in a room by himself and that was deemed ineffective. P5:00:39:00 – 00:54:00 (approx.). See P4. P.129-131. This is why Student's placement was defined across the 3 settings. Furthermore, Parent testified of Student's success in the home and community environments. To order Student into a program that excludes the home and

community, even at the beginning of his program, would run counter to the determination of his IEP team and to his current demonstrations of success. All three settings were to be part of a wholistic hybrid approach.

The third alternation to the agreements made by the 02/05/2020 IEP Team was to the Individual Instructional Support services in the clarification section of Student's IEP at P1/015, as follows:

> Student will receive individual instructional support from an RBT or qualified paraprofessional who demonstrate skills and competency in behavior management. Along with Individual Instructional Support, a program support of an additional professional or paraprofessional will be utilized for data collection and program implementation.

This issue is identified in the Prehearing Order as Issue 3.

*Issue 3 – Whether the 02/05/2020 IEP document accurately reflects the agreement of the IEP team for Student's supports and services, specifically the clarification of supports and services regarding student's Individual instructional support providers.*

The IEP team specifically determined that Student would continue to have at least 1 Registered Behavioral Technician. P5:00:30:00 – 00:31:20 (approx.). The written IEP inaccurately states that Student could have the services of 1 RBT and a paraprofessional or 2 paraprofessionals. This is not what the IEP team determined was necessary and would also be in violation of the current laws according to Mr. Beau Laughlin and according to statute. Tr. p. 364:19-25, 365:1-13. and See HRS Chapter 465D (P5/165-170).  While the DOE apparently sough flexibility in the implementation of Student IEP, the language in the written IEP does not reflect the

decisions of the 02/05/2020 IEP team requiring at least 1 RBT.

**B. Whether Student's IEP Should Have Addressed his Needs for Transition Supports/Service Between his then-current Placement and the Anticipated Placement.**

Student was out-of-control at the public school. The DOE introduced

sufficient proof of this in a record of what happened on a day not long before the

02/05/2020 IEP meeting. It started at 8:02 a.m. when Student arrived at school and

within 30 minutes, he had broken a computer. Then he ran outside grabbed a rock,

threatened the school staff, threatened to burn down the school, screamed and choked

a school staff member, all before 9:30 a.m. DOE p. 299-300. Another recordation of

Student behaviors at school can be found at DOE 308-312 from 02/03/2020. This

issue is identified in the Prehearing Order is as follows:

*Issue 4 - Whether the 02/05/2020 IEP offer fails to include a description of the process and/or supports Student needs to enable him to access his program given the changes, that should have been anticipated and/or were known from his then-existing program to the new program in his new IEP.*

Any successful change in Student's program and placement from the public

school to a home, community and clinical setting would impact Student's

emotional/behavioral stability. Yet there was little in the way of a discussion about

this impact. Would he start in the home and community and then gradually be coaxed

into a classroom-like environment over time, or would he immediately be isolated for

6 hours a day alone with and RBT and a second person in a room with nothing to use

as a weapon? The only consideration about transition from his then current

14

placement was to use the spring extended school year session to make the move. P1/014 (Student will attend ESY for spring break 2020 for transition purposes to an alternative placement. He will attend ESY for 4 hours a day March 16-20). The 02/05/2020 IEP was completed on 02/05/2020 and Student was to wait until March 16, 2020 for spring break in order to transition. This was the only support the DOE offered. Couldn't Student have started in his home and community setting and been introduced to his new RBT? Couldn't Student see his new classroom and be encouraged to design the space or told about how he could earn rewards? No thought went into how Student could successfully transition into his new program but to wait for spring break. After determining that Student's current program was inappropriate and that he needed a different program on 02/05/2020, the DOE was obligated to transition him. Not leave him to languish for another 30 days in the program that wasn't working.  The DOE agreed that a transition plan was needed in a letter sent to Parent on 03/06/2020. In that letter Principal Winkie stated, "We agree that a transition plan is needed for the successful implementation of Student's new individualized Education Program (IEP). Development of such a plan would be the natural progression of team discussion at our next meeting." DOE 343. In the last paragraph of this same letter Principal Winkie states, "If you are unable to join us, the school team will develop a transition plan that will be shared with you.". It was the purview of the IEP team to develop the supports Student needed to transition. If these services were necessary for the "successful implementation" of Student's

program, the IEP could not have been implemented without them and therefore it is a missing element of Student's substantive offer of FAPE.

The question of whether the IDEA otherwise requires transition plans to be included in an IEP is unsettled. See *R.E.B. v. Haw. Dep't of Educ.,* 870 F.3d 1025, 1027–28 (9th Cir. 2017) reh'g granted, opinion withdrawn by 886 F.3d 1288 (9th Cir. 2018). However, Plaintiffs never alleged a transition plan was needed. If a student requires supports and services to affect a successful change from one program to another then those are services and supports that are required to be described in the IEP. In this case, the DOE has admitted that such services and supports are integral to Student's access to FAPE and asserts that it would complete a transition plan itself, as a necessary component to a successful transition. Simply because the DOE calls this set of services and supports a transition plan does not mean it can be developed in a separate meeting or not at all. Thus, in the instant case, failing to develop the means to implement the IEP where such means were deemed essential constitutes a denial of a FAPE because it "result[ed] in the loss of an educational opportunity, seriously infringe[d] the parents' opportunity to participate in the IEP formulation process and cause[d] a deprivation of educational benefits." *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 953 (9th Cir. 2010).

Additionally, the Ninth Circuit has found a denial of a FAPE where necessary services were not made part of the IEP, because services unincorporated into the IEP could be changed unilaterally and did not have the same procedural safeguards as an

IEP. See *M.C.*, 858 F.3d at 1198–99.

**C.    The DOE Never Tendered the 02/05/2020 IEP Program that the IEP Team Developed.**

Plaintiffs have demonstrated that the written IEP was not reflective of the IEP that Student's 02/05/2020 IEP team believed would be appropriate. That violation alone is sufficient to deny Student FAPE since Parent would not be able to enforce the terms of Student's IEP, as it was decided by the IEP team and, because the offer was not what the IEP Team determined was appropriate and necessary for Student. A substantive violation of FAPE. However, the DOE also never provided or tendered the IEP to Student, even in its sanitized form.

The Prehearing Order describes this issue as follows:

*Issue 9 - Whether the DOE did timely offer to implement and/or tender implementation of the 02/05/2020 IEP.*

Principal Rebecca Winkie knew that she was required to implemented the IEP on 02/06/2020. Once the IEP team determined what the Student required, it was the DOE that had the obligation to provide it. Tr. p. 302:15-25. In fact, Student's attorney emphasized this during the IEP meeting. P5:01:10:20. Instead, the DOE decided to engage Parent in discussions about who should implement the program. This was legally unnecessary.

The first "Team Meeting" was held on 02/18/2020. In a letter dated 02/28/2020, the principal claimed that Bocha Inc., was offered as the program to

implement Student's IEP. See P3/078. She also said in that letter that the meeting

was to discuss options. In testimony the principal testified that the details of the

Bocha program may not have been discussed during that initial meeting. Tr. 282:9-

12. Beau Laughlin, the owner of Bocha, Inc., testified that his discussions with

DOE regarding implementation of Student's IEP never proceeded beyond asking him

if he would be interested in providing the services. There was no space leased, his

personal office space would not have been used for the program and he would not

have agreed to provide any services in Student's home. Even a program that did not

envision the inclusion of a Home and Community setting was never capable of being

offered by the DOE to Parent because it was never in existence. According to Beau

Laughlin, he never was contractually obligated to provide any program for Student.

Tr. p. 361:22-25. In further questioning, Mr. Laughlin again stated that he was never

contractually obligated to do anything at all. Tr. p. 376:11-14. This means that while

the DOE could have offered Bocha, Inc. to Parent as a possibility, it was not

tendering as a currently viable provider of the IEP. The DOE could not tender what it

did not possess.

   Even if the negotiations between Mr. Laughlin and the DOE proceeded to an

agreement to provide certain services, he did not want to implement the actual IEP

that the IEP team developed. Tr. p. 364:19-23. On cross-examination Mr. Laughlin

stated that in the future he might be able to provide parent training to the home

environment or do that virtually, but his issue was "liability" (Tr. p. 365:12-24), and

how much progress was being made by Student. Tr. p. 365: 25-366:1-22. And in further cross-examination, Mr. Laughlin again stated that he had a lot of concerns implementing Student's program in the home and community settings. Tr. p. 373:2-13. Mr. Laughlin also pointed out that he would have required Parent's collaboration to implement Student's program. Tr. 374:6-10. But, Parent had refused to consent to Mr. Laughlin's participation. Tr. 374:12-16. Parent did not have to agree to an outside contractor. Parents consents to the provision of special education and related services after the student is made eligible. In *I.R. ex rel. E.N. v. L.A. Unified Sch. Dist.*, 805 F.3d 1164, 1167 (9th Cir. 2015), the court held that:

> However, 20 U.S.C. § 1414(a)(1)(D)(ii)(II) and its implementing regulations, by their plain text, foreclose a school district from initiating a due process hearing only where a parent has refused consent before the initial provision of special education and related services. Clause (i)(II), the parental consent provision to which § 1414(a)(1)(D)(ii)(II) refers, states that a school district must obtain parental consent "before providing special education and related services to the child." 20 U.S.C. § 1414(a)(1)(D)(i)(II) (emphasis added). The implementing regulation similarly forecloses a school district's ability to file a due process complaint and relieves it of its duty to provide a FAPE only "[i]f the parent of a child fails to respond to a request for, or refuses to consent to, the initial provision of special education and related services . . . ." 34 C.F.R. § 300.300(b)(3) (emphasis added).

No further consent is required by a parent for the school to be obligated under the IDEA. The DOE still had the same responsibility to implement the IEP, even without specific consent from Parent for a particular contracted service provider.

On redirect Mr. Laughlin acknowledged that his willingness to consider adjusting the services he would offer is not necessarily an invitation to require him to

provide in-home services, but simply an openness to discuss that possibility. Tr. 3753-14. He also clarified that liability and establishment of cooperation and trust would have to be addressed between himself and the Parent if he were to *ever consider* providing in-home services no matter when he might be asked to provide them. Tr. 376:15-25, p. 377, p. 378:1-6. He stated that that trust had not be established between himself and the Parent by that juncture. Tr. 378:7-9 & 15-21, p379:21-25, p.380:1-4. Certainly, Mr. Laughlin's company Bocha, Inc. was not ready and willing to implement the IEP that the 02/05/2020 IEP team developed for Student as of 02/18/2020, the date of Dr. Winkie's email to Parent.

If Parental cooperation was a threshold problem for Mr. Laughlin's agreement to provide a program to Student, that may have been an insurmountable obstacle for the DOE. Parent had agreed to the provision of special education and related services. The DOE had no right to demand that she agree to any specific providers before the DOE's obligation to tender the provision of services arose. Had the DOE actually had a program available to implement the actual terms of the IEP that the IEP team developed and offered to Parent, they would have met their obligations even if Parent rejected the program. Involving a provider that demanded Parent first demonstrate a collaborative attitude thwarted the DOE's efforts but did not shift the responsibility from them onto Parent.

On 02/19/2020 the second "Team Meeting" was held. At the meeting, the DOE agreed to do observations at Maui Autism Center ("MAC"). See P3/078. In

February the DOE sent staff to do an observation at MAC. On a date unknown, Parent did an observation at MAC and testified that the door to the clinic was not locked when she arrived and that the clinic was adjacent to a busy parking lot and road. She also testified that the room was filled with objects and toys and clutter. She further testified that there were other very disabled children in the clinic. Additionally, she said that there was a small dirty bathroom-size sensory room with dirty objects inside and that it took one hour to get to the clinic from her home. After the visit to MAC, Parent wanted to pray and discuss, with his Kaiser team, if MAC was an apprriate location for Student's program. DOE 323.

When the DOE decided to allow Parent to participate in the process of determining an appropriate provider to implement the IEP plan, it ran the risk of failing to meet its legal obligations to tender the Student's program.  This risk was realized when this course of action resulted in no tender of Student's program.

In the Ninth Circuit case, *Doug C. v. Haw. Dep't of Educ.,* 720 F.3d 1038 (9th Cir. 2013) the Court restated the maxim that the school cannot shift the blame on a parent where it fails to act on an affirmative obligation of its own.[1] In Doug C., the

---

[1] We have consistently held that an agency cannot eschew its affirmative duties under the IDEA by blaming the parents. See *Anchorage Sch. Dist. v. M.P*., 689 F.3d 1047, 1055 (9th Cir.2012) ("[P]articipating educational agencies cannot excuse their failure to satisfy the IDEA's procedural requirements by blaming the parents ."); see also Target Range, 960 F.2d at 1485 (holding that the school district could not blame parents' choice to leave an IEP meeting for its own failure to create an IEP with the participation of the appropriate parties). **An agency cannot blame a parent for its failure to ensure meaningful procedural compliance with the IDEA because the**

school claimed that the father cancelled an IEP 3 times at the last minute and refused to say anything at the revision IEP meeting after the DOE completed the IEP without him the previous month. In this case, Parent was invited to participate in the deliberations as to the proper contractor to implement Student's program. Merely because she was emotionally unproductive or unavailable in doing so cannot shift the blame to her for the DOE's affirmative duties and failures.

At some point after the IEP, Parent removed Student from the school when she saw what his classroom looked like, some time before spring break. Parent cancelled the third "Team Meeting" on 02/27/2020. DOE 327. Principal Winkie wrote Parent seeking to reschedule the meeting and schedule "transition discussions". DOE 329. Parent responded that she would get back to the principal in a few days. DOE 331. At the hearing in this matter, Principal Winkie testified that she has never met with the "Team Meeting" members who observed at MAC and did not know if MAC was appropriate or not. Tr.p. 293:9-17.

The 02/28/2020 letter from Principal Winkie also stated, "*While the separate*

---

**IDEA's protections are designed to benefit the student, not the parent.** As we explained in Amanda J., parental participation is key to providing the student an adequate education because "[a]n IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved." 267 F.3d at 892.5 Because the Department's obligation is owed to the child, any alleged obstinance of Doug C. does not excuse the Department's failure to fulfill its affirmative obligation to include Doug C. in the IEP meeting when he expressed a willingness (indeed eagerness) to participate, albeit at a later date.6

*facility is being determined*, interim services remain available at Princess Nahienaena Elementary School." and "The purpose of our meeting scheduled on February 27, 2020, was for DOE to report observations and confirm the IEP placement at MAC." P3/078; DOE 333/335. This letter, therefore, indicates that **the DOE still did not have a provider willing to implement Student's IEP**, for this matter was up for discussion. Furthermore, the written IEP, being different in several ways from the agreements made during the IEP meeting, could not have been the basis of an offer to implement the FAPE; it was not what the IEP team believed was appropriate for Student. Also, Parent's testimony that the clinic at MAC had an unlocked door, and was adjacent to a busy parking lot and roadway, was filled with objects that could be used as weapons and had severely disabled children that would also be attending the clinic might have resulted in the "Team Meeting" members finding that MAC was actually not an appropriate program in which to implement Student's IEP, had they actually discussed this issue.2

On 03/30/2020, Victoria Leworthy emailed Howard Greenberg, owner of MAC and inquired whether he "…still had availability for this student to be placed in your program or a hybrid/transition program between home and school. DOE 346.

---

2 Testimony by Beau Laughlin confirms what the audio record evidences, that the team understood one of Student's triggers for behavioral outbursts as being in a space with disabled students. Additionally, elopement is a constant issue for Student. Furthermore, the DOE knew that Student takes every opportunity to use objects as weapons. Tr. 362:24-25, 363, 3641-7. See also DOE 299-300, DOE 308-312.

Mr. Greenberg responded that he did have space at his center, even during

"the COVID-19 crisis." DOE 347. However, Parent was not offered MAC as a

program for the implementation of Student's IEP, at this time. She wasn't informed

of this interchange between Ms. Leworthy and Mr. Greenberg.

On 03/20/2020 the DOE was sent a description of the proposed alternative

program by Parent. P4. P. 129-131. On 03/23/2020 the First Amended Complaint

was filed alleging that the DOE changed the Student's agreed-upon placement and

other determinations made by the IEP team when it drafted the IEP document. The

identified remedy was funding for an alternative program. This constituted the notice

to the DOE under 10-day rule. See (20 U.S.C. Sec.1412(a) (10)(C)(iii)

On 04/20/2020 Principal Winkie sent Parent an email requesting her

participation in a meeting on April 22, 2020 to "…share the continuity of learning

and enrichment activities that are available to Student during the statewide school

closures." DOE 351. In that letter Principal Winkie also states:

> Also, the transition to which I was referring was the transition to a separate
> facility when we are no longer under "stay-at-home" orders as per the IEP
> completed on February 5, 2020. The need for this transition plan was
> confirmed in your email to me dated March 3, 2020, which specifically stated,
> Whether the IEP is provided by MAC, or some other provider, *remains to be
> determined*, but what have (sic) been determined by the IEP team is the need
> for a process of transition to help Student make his new IEP a success. This
> was explicitly addressed and determined to be necessary by his IEP team.
> Additionally, I would be against medical advice to do otherwise."

This letter confirms that no program was yet identified by the DOE for the

implementation of Student's IEP by 04/20/2020.

On 04/23/2020, Parent responded to Principal Winkie's April 20, 2020 email (DOE 351) that the transition she had mentioned in her March 3, 2020 email was the transition the IEP team had agreed was necessary to develop for the implementation of the Home, Community and Clinical setting. However, since Parent's March 3, 2020 email she had discovered that the written IEP document did not reflect the decisions of the IEP team and instead placed her son in separate facility; isolating him from all other children. In the March 3, 2020 email, Parent rejects transition to a "separate facility" and reminds Principal Winkie that when she discovered the misstatements in the IEP about placement, her attorney filed an Amended Complaint, there was a Resolution Session meeting and Student was to start an alternative placement with future transitions from the alternative placement being speculative. They were talking about 2 separate ideas of transition, in other words.

Even without having determined whether MAC was an appropriate placement, according the Principal Winkie's testimony (Tr. p. 293:9-17), the DOE offered MAC to Parent (after COVID-19 concerns subside). Yet this was not the tender the circumstance require. Implementation requires an act. The DOE must show up at the door, not merely say they are willing to do so. In that offer there is no mention of the home, community setting described by Student's 02/05/2020 IEP Team. P5/208-209.

Lastly, Principal Winkie testified that as of 05/28/2020 Student is still enrolled

in the DOE. Tr. p. 338:15-25.

On 2 fronts, the 02/05/2020 IEP that was developed for Student has not materialized. On the one hand, the written IEP does not reflect the decisions the IEP Team made about the program deemed appropriate to help Student, and on the other hand, the DOE is still dawdling unwilling or unable to find a provider ready and willing to deliver that IEP, even in its sanitized form.

### D.    The DOE's Prolonged Failure to Implement Student's IEP Constitutes Deliberate Indifference Calls for a Remedy that Places Parent in Control of the Delivery of Services.

The hard question presented by this matter is defining a remedy. As of the date of this Opening Brief, the DOE has only made the barest of efforts to implement Student's IEP. In or about November 2019, the DOE finally offered a to-be-contracted private services provider; MAC. Parent readily agreed. However, MAC sent Parent a contract that would have made her liable for the costs of implementing the IEP and would have also waived her ability for a legal remedy if MAC was negligent and an injury occurred to Student. On November 30, 2020, a meeting was held between the parties and Parent was told that a new service provider was found; Bocha, Inc. Since that date, the DOE send Parent pictures of DOE and private providers staff with written introductions. Something that the participants at the November 30, 2020 meeting felt was an appropriate first step to gain Student's trust. Parent enthusiastically agreed stating that she was open to

whatever could help her son. Unfortunately, even this minimal first step was unsuccessful. Student reportedly has become retraumatized by this minimal contact from his old school. Nothing has occurred since that virtual contact occurring way of pictures and short written hellos to further these efforts.

The February 5, 2020 IEP team listened to Parent about Student's needs and agreed that an important element for his education wbyas the home and community environment. Student fears a return to his old school. Initially, his program should meet him *where he is* comfortable and slowly allowing him to acclimated back into a small program with a few peers after he is under *instructional control*. This is in keeping with the intensions of his February 5, 2020 IEP team. The remaining question is whether this can be accomplished by the efforts of the DOE. Seemingly, Student will not cooperated with the people he feels have mistreated him. Even if this perception is unwarranted, it is one of his needs that must be addressed. Therefore, although perhaps unorthodox, allowing Parent to run the program as originally sought though the administrative hearing complaint is the only remedy that will address these unique needs and the only manner in which Student has ever been able to achieve some educational and emotional progress in the past several years. Parent only requests reimbursement for actual costs. She seeks no markup or profit.

Plaintiffs plead the elements of deliberate indifference in their appeal and

original claim. The level of indifference the DOE has shown to its obligation to Student warrants placing Parent in control of his program. She has proven effective in this regard.

Recently the Sixth Circuit Court of Appeals made a bold and profound realization when it addressed the issue of whether a parent had standing to sue a school district even where the services of the private school had been provided to a child without the parent having actually paid any money towards the services. The Court still found a valid contractual obligation existed. See *E.M. v. N.Y.C. Dept. of Educ.*, 758 F.3d 442, 460 (2d Cir. 2014). The Court also recognized that many parents cannot afford to pay for services and hope for reimbursement.

> Where, as here, parents lack the financial resources to 'front' the costs of private school tuition, and in the rare instance where a private school is willing to enroll the student and take the risk that the parents will not be able to pay tuition costs—or will take years to do so—parents who satisfy the Burlington factors have a right to retroactive direct tuition payment relief.

The same underlaying principle could be applicable here. In this case, Parent could not afford to pay for services and hope for potential reimbursement in the future, but she did create a plan and a program and was ready to implement that program. If nothing else, Plaintiffs have proven the deliberate indifference of the DOE. Mark H. v. Hamamoto, 849 F. Supp. 2d 990 (D. Haw. 2012).

Plaintiffs have not sought money damages but the right to substitute itself for an inept, rouge and indifferent state agency, as the private providers the DOE has

sought but not found in the preceding 10 months. Adoption of this remedy would act as a signal to the DOE. Any other remedy would also act as a signal to a school system that has demonstrated, in this instant matter, a sense of "immunity".

## IV.    CONCLUSION

Plaintiff request that this Court order the DOE to fund and allow Parent to control the provision of her son's services as discussed during the February 5, 2020 IEP development meeting.

DATED: Irvine, California, December 14, 2020.

/s/ Keith H.S. Peck
KEITH H.S. PECK

Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| In the Matter of B.B., by and through his mother K.B.,<br><br>                  Plaintiffs,<br><br>    vs.<br><br>DEPARTMENT OF EDUCATION, STATE OF HAWAII and CHRISTINE KISHIMOTO, in her official capacity as Superintendent of the State of Hawaii, Department of Education,<br><br>                  Defendants, | Civ. No. 20-00350 HG-WRP<br> (other civil action)<br><br>CERTIFICATE OF WORD COUNT |

## CERTIFICATE OF WORD COUNT

Pursuit to Local Rule 7.5, I hereby certify that the font used in the OPENING BRIEF was Times New Roman, the font size was 14 for main text and footnotes and the computer-generated word count is 7,521 words, exclusive of the Certificate of Word Count and Certificate of Service.

DATED: Irvine, California, December 14, 2020.

s/ Keith Peck
KEITH H.S. PECK

Attorney for Plaintiffs

30

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| In the Matter of B.B., by and through his mother K.B., | Civ. No. 20-00350 HG-WRP (other civil action) |
| Plaintiffs, | CERTIFICATE OF SERVICE |
| vs. | |
| DEPARTMENT OF EDUCATION, STATE OF HAWAII and CHRISTINE KISHIMOTO, in her official capacity as Superintendent of the State of Hawaii, Department of Education, | |
| Defendants, | |

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2020, before 12:00 p.m.

Hawaii Time, a true copy of Plaintiffs Opening Brief was duly served

electronically through CM/ECF as follows:

RYAN ROYLO, ESQ.

DATED: Irvine, California, December 14, 2020.

s/ Keith Peck
KEITH H.S. PECK

Attorney for Plaintiffs